Complaint Page 1 of 31

United States District Court
Eastern District of Texas - Lufkin Divison

Frank W. Rodriguez Jr., #1667156
Plaintiff

    -V-

Mohamed Touhami, Lieutenant
Frank Rigsby, Sergeant
Joe Collins, Sergeant
John Doe-One, Corrections Officer
John Doe-Two, Corrections Officer
John Doe-Three, Corrections Officer
Janice Hanson, Nurse Practitioner
Patrick MulDowney, Physician Assnt.
Tommie Haynes, Warden
Center Control Picket Officers
Kerri Howard, Corrections Officer
    Employees of Gib Lewis Unit,
    a Texas State Prison;
    in their individual and official
    capacities;
Defendants

AMENDED
COMPLAINT

Civil Action No:
    9:17cv 74

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

JUL 14 2017

BY
DEPUTY _____

## I. JURISDICTION & VENUE

1. This civil action is authorized by 42 USC Section
   1983 to redress the deprivation, under color of state

Complaint Page 2 of 31

law, of rights secured by the Constituition of the United States. The court has jurisdiction under 28 USC Section 1331 and 1343 (a)(3). Plaintiff Rodriguez seeks declaratory relief pursuant 28 USC Section 2201 and 2202. Plaintiff Rodriguez's claims for injunctive relief are authorized by 28 USC 2283 & 2284 and Rule 65 of the Federal Rules of Civil Procedure.

The Eastern District of Texas - Lufkin Division is an appropriate venue under 28 USC Section 1391 (b)(2) because events to this claim occurred within jurisdiction.

## II. PLAINTIFF

2. Plaintiff Frank W. Rodriguez Jr., was and is, at all times herein mention, a prisoner of Texas Department of Corrections. Plaintiff is currently confined at the Gib Lewis High Security Unit; Woodville, Texas, 75990; where events take place. Henceforth Plaintiff also refers to himself in the subjective and objective pronouns: I, my, me, etc.

## III. DEFENDANTS

3. Defendant Mohamed Touhami is a Lieutenant at GibLewis Unit. He bears legal responsibility for the operation of Gib Lewis High Security, for subordinates adhering to policy and regulation, and welfare of

inmates. At all times mentioned held that rank.

4. Defendant Frank Rigsby is a Sergeant at Gib Lewis High Security, is responsible for educating and detailing policy and training to subordinates, and the welfare of inmates.

5. Defendant Joe Collins (Pun) is a Sergeant at Gib Lewis High Security, is responsible for educating and detailing policy and training to subordinates, and the welfare of inmates.

6. Defendant John Doe-One is a Correctional Officer at Gib Lewis Unit High Security, and was at all times mentioned assigned to high security, and responsible for carrying out daily procedures.

7. Defendant John Doe-Two is a Correctional Officer at Gib Lewis Unit HS, and was assigned to high security, and responsible for carrying out daily procedures.

8. Defendant John Doe-Three is a Correctional Officer at Gib Lewis Unit HS, and assigned to high security, and responsible for carrying out daily procedures.

9. Defendant Janice Hanson is a licensed Nurse

Practitioner and on-site resident of Gib Lewis Unit HS, and at all times mentioned was legally responsible for the somatic health care of inmates, and has authority to prescribe any treatment.

10. Defendant Patrick MulDowney is a Physician's Assistant and is contracted by TDC-UTMB to provide somatic health care to inmates, and has authority to prescribe any treatment, and thereby legally responsible. MulDowney resides in Galveston, Texas.

11. Defendant Tommie Haynes is Warden of Gib Lewis Unit, State Prison of Texas, at all times held that rank, and is responsible for the conduct of his subordinates, and the implementing of policy and operation of Gib Lewis, and ultimately responsible for all the inmates therein.

12. Center Control Picket Officers, the 3, or so, officers which operate the mainframe computer and maintain the functioning of Gib Lewis Unit High Security, and regulate movement of all guards, employees, and inmates by granting access to all locations from the mainframe which controls all electronic doors, all intercoms, all electrical outlets, all lights, etc; and can lock any of those devices to **off or on**, or open or closed.

13. Defendant Kerri Howard is a Correctional Officer at Gib Lewis Unit H5, and assigned to high security, and responsible for carrying out daily procedures.

14. Each defendant is sued individually and in his (their) official capacity. At all times mentioned in this complaint each defendant acted under color of state law.

## III. FACTS

15. At all times relevant to this case Plaintiff was and is the subject of malicious and devastating verbal degrades, cruel and unusual psychological tactics cleverly enacted to resemble neurotic type symptoms to slur threats at Plaintiff. These degrades started shortly after arriving at Gib Lewis H5 on March 5th 2014 for having a "bad attitude" and being a "major snitch and gay." This stigma imputed onto Plaintiff is the impetus of motive fueling officer's conduct towards Plaintiff. A report of these sadistic degrades and psychological tactics is attached as Exhibit A.

16. That corrupt permeated practice continually makes Plaintiff the target of prejudice, devious acts of deprivation, pejorative hostility, acts of conspiracy, and treatment atypical to ordinary incidents of prison life in contrast to other inmates. That on May 8th

2015, I had just been on K-wing for 3 days for receiving a level one status, when shortly after noon I cover my cell door window with a sheet (like every one else) to defecate. Minutes later the wing officer tells me to take sheet down. I politely tell him to give me 20 minutes to defecate, and I will. He starts demanding. I remind wing officer pointing out he's never asked anyone else to take it down, I get assertive at atypical treatment. Wing officer radioes for supervisor.

17. It's policy for a Sergeant to first try resolving disputes, but Lieutenant Touhami arrives. Guard tells Touhami the circumstance. I tell Touhami that I was just going to defecate and take it (sheet) down right after. Touhami tells me to take it down. At this point the sheet was only covering half the window, I took remaining half down. As Touhomi started to leave, I turned away from the door and said, "How the hell am I suppose to shit?" in a loud voice. Touhami takes a couple of steps back to Plaintiff's cell door and said, "Pack up. You're going back to D-wing." D-wing is the major case disciplinary wing Plaintiff was just on three days prior. This was Plaintiff's Due Process violation. Plaintiff never received a case, or the opportunity to defend himself in court.

Complaint Page 7 of 31

18. An hour later John Doe One and John Doe Two arrive to take Plaintiff to D-wing. Officers cuff Plaintiff's arms behind his back before extracting him from cell. Plaintiff's arms remained cuffed behind his back at all times until placed into a D-wing cell.

19. With Doe One on my right, and Doe Two on my left, we enter into the first floor main hallway. Immediately we see the Chaplain, Sgt. Collins, Sgt. Rigsby, and three other officers huddled positioned near center of long hall. (Plaintiff believes most of this group witnessed Touhami kick Plaintiff).

20. As we pass this group Lieutenant Touhami realizes I'm in the hall and quickly comes out of his office at far end of hall. Touhami disingeuously starts heading towards Plaintiff, as if going the opposite direction; I noticed Touhami's contriving demeanor with thespian reject expressions. John Doe One and Doe Two had been ranting discursively, when Doe One said, "Catch I.D. Get some respect," real fast between his other syntax. This is an established technique used to impress ideas. "Catch I.D." means to fight or do something violent to get respect, mostly used only on inmates who are incessantly harassed or the tractable. Refer to Exhibit A for details. At this point Plaintiff knew

this was conspired by Touhami and both Does.

21. As Touhami passes my left, out of exhaustion from
repression for being the target of their incessant verbal
degrades and other acts of deprivation (not cause of what
Doe One said, though knowing they had conspired to
provoke me to such a reaction was also repressing),
I made a short quick jerk movement with my left leg.
It took two seconds before Doe One and Two push
me down to one knee-genuflect, then caustiously lay
me over onto my chest, putting their entire weight onto
my lower back with their legs and pushing down on
my shoulder blades with their hands. I don't move,
I said nothing.

22. Completely prostrate with my face turned to my
left, Touhami nears 12 inches from my face, gritting
his teeth acting mad; he mumbles and wavers while
noticeably reflexing his right foot several times
towards my face as if wanting to kick my mouth.
Touhami continued this angry mannerism for two
minutes. I don't move, I said nothing.

23. Then Touhami goes around to my right side. At this
point Touhami conspires to inflict excessive force
with both Does. John Doe One lifts his weight as

if to stand. Thinking they were about to pick me up, I lifted my head when I suddenly feel a boot hit the top of it slamming my jaw to the floor. "No one said move," Touhami said angerly.

24. Five seconds later I feel a sudden sharp impact to my right ribs followed by tremendous pain. Refer the radiology report attached as Exhibit B. I could tell from the heavy weight of the hit that Touhami kicked me. Still I don't move, I said nothing. The extreme pain lasted for several weeks and greatly limited daily activity and sleep for Plaintiff.

25. Lieutenant Touhami radioes a use of force response. At this point Touhami and Does conspire again, to inflict another beating of excessive force on Plaintiff, by using non-verbal gestures. Five minutes later the response team shows up. I am picked up by John Doe One and Two then pushed prostrate against nearby wall. I look back over my right shoulder and see three guards, Sgt. Rigsby, and Sgt. Collins standing 7 feet behind me. Sgt. Collins was holding the video camera, Touhami asked if the video camera was on. Sgt. Collins gives a quick vacillated answer with an exaggerated gesture as if regretting the first answer, "Oh, I mean...."

Complaint Page 10 of 31

26. Immediately after hearing Collins's corrected answer John Doe One and Two jolt with ratified instincts and commense assualting Plaintiff. John Doe One (on my right) started punching my face several times, then my right ribs repeatedly, then he alternates between both sites. While he repeatedly said, "This is for being a dick sucker. For being a true bitch. For being a ho. For being gay." Doe Two had started punching Plaintiff's left ribs repeatedly and the back of his head.

27. I tuck my head down to my right shoulder as both beat me trying to protect my face. I try looking up when I sensed a pause from Doe One punching my face and right ribs. Only to find John Doe Three had taken One's place. Doe Three starts repeatedly punching my face about the right eye, saying, "For being a bitch. For being a ho. For being gay." Doe Two is still perpetually punching Plaintiff's left ribs. John Doe Three continued striking Plaintiff's face for a minute. Plaintiff does not move, nor says anything.

28. After Doe Three stops striking my face I try looking up again thinking beating had stopped only to see Doe One quickly repositions himself at my right and again punches Plaintiff, alternating between Plaintiff's face and right ribs for another 30 seconds until Plaintiff

finally broke his silence, saying, "Alright. Alright. I didn't do anything." Assualt stops. Plaintiff had severe pain on the right side of face lasting several days, and two golf ball size extrusions around right eye that lasted several hours. The Use of Force medical evaluation is attached as Exhibit C, this report incorrectly notes contusions; they were extrusions. Doe One exacerbated Plaintiff's right ribs extending the excruciating pain Plaintiff had to endure which lasted over 6 weeks.

29. During the entire beating no one tried stopping it. The Lieutenant, both Sergeants, the male nurse, nor any of the other witnesses standing only 7 feet away. Plaintiff claims this inaction violated his Fourth and Fourteenth as well as Eighth Amendment constitutional rights; and so did the act of beating Plaintiff.

30. After a pause I am turned to my left where a male nurse was already standing 24 inches from me, he takes a photo of my face. I am taking into D-wing and pushed against the wall by a cell door. As we wait for cell door to open I looked and see Touhami about 20 feet behind me acting very anxious because I was very calm and silent. John Doe One (now on my left) also noticed Touhami's anxiousness, and said,

"It's okay if you yell and act-up. Nothings gonna happen to you," as he gently padded my left shoulder. I Knew he was trying to inveigle me into acting mad or erratic to capture on camera as a means to justify their excessive force. Plaintiff stayed calm.

31. I am placed into the cell two minutes later, I stare in the mirror at the two golf ball size extrusions around my right eye. An hour later Sgt. Rigsby returns to take another photo from outside the cell's door and Plaintiff 8 feet away. I look in the mirror and notice extrusions had reduced to 3/8th of an inch. Plaintiff believes this second photo was to replace first photo.

32. Three days later the Use of Force form was deviously taken from my cell unknowingly during a cell inspection. Plaintiff repeatedly asked for grievance forms but was given the excuse, "There are none," by guards working wing for several weeks. Plaintiff was not able to file a Use of Force form or grievance this event in a timely manner for these reasons.

33. As further forms of punishment and retaliation I was forced to sleep on only 2 sheets for nearly 8 weeks which exacerbated the pain of my ribs making it impossible to sleep or physically

Complaint Page 13 of 31

recuperate. Every attempt at obtaining extra sheets, or a blanket, or a mattress were met with disdain and the phrase "submit a request form."

34. Plaintiff was afraid of further harassment and retaliation for submitting a sick call request (noted in the report attached as Exhibit A), but the pain was excruciating and would not recede so Plaintiff submits a medical sick call a week later.

35. The x-rays were taken on 5-22-15. Ms. Hanson viewed the x-ray results on 5-26-15, but still made Plaintiff wait an extra three days before scheduling an appointment on 5-29-15. Those three days only prolonged the acute pain. On the 29th Hanson, a Nurse Practitioner, confirms a displaced 9th rib, and the 8th and 10th ribs fractured. Consistent with the impact of a boot, that is, a kick. Hanson immediately starts with her typical demeanor to express disdain towards Plaintiff. After an impetuous exam, Hanson only offers Naproxen. I remind her that she knows painkillers don't work on me, that the only thing (medication) that works on me are steroids. Plaintiff has repeatedly made Ms. Hanson aware of these facts since arriving on Gib Lewis, in early 2014, for his established left shoulder and lower back injuries.

Plaintiff also reminds Hanson of his extensive medical history which extends to the freeworld as far back as 2000, and has proven steroids are the only meds that work on Plaintiff; also noting that steroids are one of the most common meds in palliative care to the countless millions who don't respond to painkillers. When I desperately try to reason with Hanson, she terminates the visit as has become her custom towards me. Plaintiff had to endure more sever pain. Furthermore, Hanson deliberately lies in her exam report about what was actually said, lies about the extent of physical exam, and goes as far to add lies about circumstances taking place in Plaintiff's cell. It is without doubt she was deluding, minimizing, and circumventing the severity of the beating and the pain Plaintiff was experiencing. This report is attached as Exhibit D. Exhibit E shows Hanson's propensity of indifference to divert from objective and subjective reasonable standards of decency with her "let me decide what's best" contravention. Exhibit F shows Plaintiff has indeed proclaimed only steroids reduce his inflammation, pain, and assist with mobility, since entering TDCJ in 2011.

36. Plaintiff had to submit another sick call because of Hanson refusing to provide adequate treatment.

Complaint Page 15 of 31

On 6-09-15 I see Mr. MulDowney on video conference. As usual he spends more time perusing through computer files in our 5 minute visit. When he finally acknowledges me, he almost immediately starts informing Plaintiff with complete contridictions to today's medical facts of research about Plaintiff's injuries, symptoms, and treatment. Plaintiff has also similarly informed MulDowney over several previous visits (as with Hanson) of medical history, the narrowing down of treatment through trail and error, etc. When I press MulDowney on his deliberately contrived statements to ill-inform he gets flustered and literally contridicts many of his previous statements. Going from "Those belts are only for when you have fractures," to "you don't want to wrap broken ribs." When I told him I needed a support belt for my back, then saying I needed one for my broken ribs. When I ask MulDowney for pain relief he says he can't prescribe steroids. As has been his present posture which has been cultivated by the rest of Gib Lewis' medical and guard staff who harbor disdain towards Plaintiff for being a "major snitch", and "not getting along." Because MulDowney has prescribed steroids to Plaintiff in the past. Eight months later Plaintiff was able to obtain MulDowney's report of that day, and noticed that MulDowney lied outright. He manufactured a deluge of discourse that was not

discussed in that visit, he cited medical facts in contridiction to today's research, and minimized the facts and extent of Plaintiff's injuries. Plaintiff had to endure more weeks of severe pain, not just from the broken ribs but his left shoulder and lower back injuries. MulDowney has a few times delibrately said he would order treatment (such as cream for Plaintiff's acute eczema), then not order it simply to spite Plaintiff.

37. Exhibit I is MulDowney's record of that visit on 6-09-15. Page 1 shows some of the manufactured text of "Pt denials." The more prominent one is underlined, where MulDowney lies about Plaintiff not waking up from sleep due to pain. Plaintiff did not say that. Infact Plaintiff could not sleep due to pain. Page 2 of Exhibit I shows MulDowney using outdated facts about lumbar stenosis and spondylosis, noting "usually produces no symptoms and asymptomatic." Those facts are taken from research derived from assumptions— an estimation— of the possible individuals with stenosis or spondylosis not suffering from symptoms, (estimated at 80 percent). MulDowney states that "Ortho study shows it is unlikely cause of pain." Again, he's being misleading, for one, I've never seen an Ortho specialist about my back; and second, that

there are other spondylotic causes, and lastly, that Plaintiff's spondylosis might be of the 20 percent that is 'active' and symptomatic with extreme pain.

38. E Pain Assist shows spinal stenosis causes discomfort in 94 percent while just standing. Epainassist.com/back-pain/lower-back-pain/lumbar-spinal-stenosis (p.5). College of Family Physicians of Canada has done studies denoting steroids are one of the most common meds used in palliative care. Ncbi.nlm.nih.gov/pmc/articles/PMC3001922 (p.1).

39. On information, conduct, and belief from Plaintiff's experience the harassment of deprivation by many of the medical personnel is in large part due to the stigma imputed by guards onto Plaintiff of being "a real snitch," and for "not playing along" with their high security games. Exhibit G shows Plaintiff was denied adequate treatment a third time, and that the malicious indifference permeates the medical department as Medical Records deliberately denied Plaintiff records for 8 months though requesting them every three weeks.

40. On or about 6-5-15, Plaintiff was taken to x-ray lab by 2 female guards for more images of ribs. The lady radiologist expresses concerns that "we need

a sergeant to remove cuffs" several times to the lady guards. As all three discuss which sergeant might be available for a few minutes, as if magically Lieutenant Touhami enters to remove Plaintiff's cuffs. Plaintiff knew immediately it was a set-up conspired to have Plaintiff "catch I.D." in order to justify the excessive use of force. Touhami stands behind Plaintiff and unlatches the waist belt that secures cuffs. While standing only inches behind Plaintiff, Touhami holds the belt and pulls it above Plaintiff's head to lift arms for x-rays. Though Touhami jovially asked the lab technician for confirmation, his demeanor changed as he left. He gestures angerly waving one hand as if to reject, saying, "Fuck him. Fuck him, if he doesn't want to get his respect back. He lost his chance." This incident caused great emotional and mental distress to Plaintiff, seeing how easily officers and medical personnel conspire to devise nefarious acts of depredation.

41. In retaliation after notifying my family and a few attorneys that I needed assistance filing this law, Sgt. Rigsby tried to discourage Plaintiff from proceeding with the lawsuit. Gib Lewis Unit had just been on a 3 week lockdock for cell searchs a couple of weeks prior. Yet on 2-27-17 Plaintiff's wing was again ulteriorly locked down in what was a very

incontrovertible act to commit harassment and retaliation to Plaintiff for working on this current lawsuit. A real lock down cell search of wing takes all day. This one took only 2 hours, and as I watched from my door, many of the other cells were not searched. Before they arrived to my cell I arrange all my property neatly in like-item stacks on the bunk. (25 valuable educational books, 3 reams of research study and legal material, over 70 magazines, and a locker full of food items). I was taken to the recreation yard by a guard. There was something very suspicious in their behavior, a group of 5. After 20 minutes I am taken back to my cell, as the lady guard and I enter the wing, I see Sgt. Rigsby at the cell adjacent to mine. When Rigsby looks up and sees me, he jolts and runs the 8 feet distance back into my cell, grabs a few empty jars, runs back out and makes sure I see him throw them onto the floor. He stands right by my door. As me and the lady guard near my cell door, she chuckles and says "What you do that for?" Rigsby responds, "Cuz you don't get along." I look into my cell and everything, everything was thrown down as if done in spite. All the books were scattered all over the floor as if literally a tornado hit. All of them thrashed open, including the magazines, and research papers. After being placed into my cell, Rigsby and the

other guards resort to their verbal psychological tauntings, "Cuz you write, Frank Rodriguez. Cuz you're a ho, Frank. Cuz you're gay, Rodriguez. Cuz you wana be rich," were some of the things they said as they finished searching the 33 other cells of which only half were even entered. ("wana be rich" means filing lawsuit). These acts of retaliation and harassment cause Plaintiff great emotional and mental distress which has been perpetual. Not to forget, damaging my property. Exhibit J is the grievance filed on this issue.

42. On 6-14-17 there was yet again another surprise lock down of just Plaintiff's wing lead by Sgt. Wood. At 2:30p.m. Woods tells me to put all my property in the large red plastic crate. I put nearly all of it neatly into the crate and leave it near my bunk. Afterwards I am taken to the recreation yard. After about 20 minutes MS. Howard retrieves me. She tries being cordial by asking a few questions then adds," All I could find in your cell is that your family loves you." As I'm placed in my cell I became greatly dispirited. All my property was scattered worse than when Rigsby thrashed my property. Ms. Howard exerted extra efforts to catapult books, and food items, and various paperwork far back into the food lockers as if the "final touches of a performance" to inflict Plaintiff

Complaint Page 21 of 31

with hopelessness and greater despondency. She made sure to scatter much more on both the bottom bunk and top bunk. Taking every single paper out of every manilla envelope and scattering those contents throughout different sites just to make all my organized paperwork disarrayed. Over half of my valuable books have been damaged cosmetically and interiorly to some degree. Though the **irreplaceable books** and research papers and personal **items** were not completely damaged in these two acts of harassment and retaliation; they very well will be completely destroyed the next time all because they don't like my "attitude". However, Plaintiff's empirical **understanding** reveals that the real motives for the guards' **harassment** and retaliation **is** because Plaintiff **is** writing about what really happens in high security prison. Aside from the significant attachment Plaintiff has for his **irreplaceable** property, the acts of harassment and **retaliation** are causing significant emotional and mental distress. Especially when Ms. Howard and Sgt. Wood resorted to their psychological tauntings afterwards, saying nearly the same things Sgt. Rigsby **said**,"Till you're whooped, Rodriguez. Cuz you wana be rich. Cuz you're gay, Frank. File a grievance," they said for the remaining two hours of cell searches. Plaintiff has just **recently** filed a grievance on this issue.

43. As further retaliation and harassment to profoundly distress Plaintiff and to impede the current lawsuit and other journalist writing, defendants have conspired to deprive Plaintiff of his cell light by locking it to off so Plaintiff could not turn it on for a few weeks. Then after a three day lapse where Plaintiff had full control of his cell's light with no flaws, defendants and Center Control Officers (who control the cell's light, electrical outlet, and air flow from a computer) decide to subject Plaintiff to 24 hour illumination. Which has caused devastating emotional and psychological distress to Plaintiff. Not only is it significantly disrupting Plaintiff's sleep, it has disrupted his daily spiritual meditations and other rituals Plaintiff practices daily, both of which defendants are well aware of, that Plaintiff performs with the light off. A significant predicate of this torture tactic isn't just they want to maliciously disrupt Plaintiff's 'light off' rituals, it's that Plaintiff knows and sees he is being singled out from among the other inmates who retain full control of their lights, and it is solely being done as retaliation for the lawsuit and his journalist writing. Again, further affirmed by the psychological tauntings said by the guards on the wing and CCO on the intercom. "Praise God. He don't care about his light being locked on. Get them to turn it off, Frank. If

Complaint  Page 23 of 31

you're man enough, Rodriguez," they say. These
tauntings are to exacerbate 'total loss of control'
already inflicted onto Plaintiff by locking the light;
and to provoke a "typical psychotic fit of rage"
to give justification to write a major case to strip
Plaintiff of his property; and to overwhelm Plaintiff's
emotional and mental stability by polarizing
cognitive incoherency: into a sensed state of
persecution.

44. It has been over a week and a half since
 informing the Warden in a formal letter about
 officers locking the light off then on as retaliation,
 but as expected he has not responded nor stopped
 CCO from locking the light. The Warden has often
 engaged with the psychological tauntings against
 Plaintiff for being "a real snitch." On June 1st
 Warden mocked the 'light problem' while visually
 inspecting wing. As he left he repeated, "You're gonna
 be rich, Frank. You're gonna be rich, Rodriguez."
Insinuating, arrogantly, that the Plaintiff has no choice
but to file suit in these matters; and impress mockingly
the fact that filing suit may do very little to redress
Plaintiff (knowing the code of silence is fierce among
guards). Letter to Warden is attached as Exhibit
 K.

Complaint Page 24 of 31

45. Plaintiff has also informed several of the guards working the wing which simply repeat my request to unlock light or "fix" it. Plaintiff has also informed the Center Control Officers who operate the computer system controlling all cell lights. All five times they claim it's the button, or wiring, or a "special part," but those excuses, in and of themselves, nearly prove CCO's disingenuous conduct of locking the light. There is nothing between the button switch (to turn light off or on) and the computer software that would cause the light to lock off or on. The "locking" can only be done by the software. Faulty wiring, or ballast, or button would have caused erratic behavior; and would have been noted on the software as a warning of 'failed to establish connection.' A faulty button would still allow the computer software full control of the light.

46. Aside from guards turning the locked light into a game of psychological tauntings, and that all other inmates have complete control of their cell light, Plaintiff relies on his extensive knowledge of manufacturing, wiring, installing, and trouble shooting light signs; and multi-messaging LED signs that are programed by software similar to what prison (CCO) uses to control the electrical devices in a cell. Another indicator is that the light turns off after count is cleared, then locked on.

Complaint Page 25 of 31

47. Significant to Plaintiff's case is that he can not confide the significant extent of his emotional and mental distress, which has even affected him physically, to any of therapist or psychiatrist because Plaintiff has observed them also engaging in the psychological antics against Plaintiff. The blonde lady therapist has especially, and ardently, degraded Plaintiff by full name when she would do cell side visits and engage in the 'Frank Rodriguez' tauntings, (Refer to Exhibit A page 13), which has diminished any confidence in the psychiatric department; and has left Plaintiff with only his family to confide his great emotional and mental distress.

## IV. Exhaustion of Legal Remedies

48. Plaintiff Rodriguez was not able to utilize the grievance system for several week following the excessive use of force because not only would guards deny to give Plaintiff any grievance forms for several weeks, the guards confiscated Plaintiff's property leaving him without a pen, shortly followed by Sgt. Collins (Pun) and Officer Roach stealing Plaintiff's identification card so Plaintiff could not buy writing supplies for six months. Refer to the report Exhibit A page 16.

For those reasons Plaintiff filed the Use of Excessive Force grievance past the submitting

Complaint Page 26 of 31

deadline. Attached as Exhibit **H**. Plaintiff implores the court for leniency. Noting this issue is not peculiar to Plaintiff. Days 322 F.3 863, Wilson 151 F.3 292.

49. Plaintiff has exhausted grievance remedy on MulDowney's delibrate indifference, and Sgt. Rigsby's retaliation to abuse proprety. Grievance remedy on Ms. Howard's retaliation to abuse proprety, and Center Control Officers locking light, have been submitted and are being reviewed. However, Plaintiff implores the court to note that on Gib Lewis Unit grievances never admit to misconduct of officers or policy.

## V. LEGAL CLAIMS

50. Plaintiff realleges and incorporates by reference paragraphs 1-49.

51. Defendant Touhami used excessive force against Plaintiff Rodriguez by kicking him in the ribs and breaking them when Plaintiff was not violating any prison rule, not acting disruptively, and was already prostrate and in restraints. Defendant Touhami's actions violated Plaintiffs rights under the Eighth, Fourth, and Fourteenth Amendments of USC, and caused Rodriguez great pain, suffering, physical injury and mental distress from the cruel and malicious punishment. Touhami

Complaint Page 27 of 31

removing Plaintiff from cell without just cause violated Plaintiff's due process rights. Plaintiff never received a case or the opportunity to defend himself in court.

52. Defendants John Doe One, John Doe Two, and John Doe Three used excessive force against Plaintiff by repeatedly punching him in the face, head, and ribs when Plaintiff was not violating any prison rule, not acting disruptively, and already restrained. Defendant's malicious actions to further beat and exacerbate injury violated Plaintiff's rights under the Eighth, Fourth, Fourteenth Amendment of USC, and caused Plaintiff Rodriguez great pain, suffering, physical injury and mental distress from the cruel and malicious punishment.

53. Defendants Sgt. Collins (Pun), and Sgt. Rigsby, to include Lieut. Touhami, action of witnessing the illegal conduct of John Doe One, Doe Two, and Doe Three without interfering to stop that misconduct violated Plaintiff's rights under the Eighth, Fourth, Fourteenth Amendment of USC for failure to interfere causing Rodriguez great pain, suffering, physical injury, and mental distress from cruel and malicious inaction.

54. Defendant Janice Hanson's deliberate indifference to Rodriguez's serious medical need violated Plaintiff's

Complaint Page 28 of 31

rights under the Eighth, Fourth, Fourteenth Amendment of USC, coalesced cruel and malicious punishment for denying adequate treatment; deviously and repeatingly refusing to adhere to professional protocal of today's standards of decency.

55. Defendant Patrick MulDowney deliberately indifferentiating Plaintiff Rodriguez's serious medical needs violated Plaintiff's rights under the Eighth, Fourth, Fourteenth Amendment of USC, coalesced cruel and malicious punishment for denying adequate treatment; deviously and repeatingly refusing to adhere to professional protocal of today's standards of decency.

56. Defendants Frank Rigsby and Kerri Howard's malicious intent to abuse Plaintiff's property as retaliation for filing a lawsuit and trying to publish articles about high security violated Rodriguez's First, Fourth, Fourteenth Amendment rights of USC; causing Plaintiff emotional and mental distress, and damaging of his property.

57. Defendants: Center Control Officers malicious conduct to lock Plaintiff's cell light to 'off' with the intentions to impede lawsuit, then conspiring again to lock Plaintiff's cell light to 'on' inorder to inflict the sense of emotional and mental persecution, and disrupt

Complaint Page 29 of 31

cognitive coherency, and deprive Plaintiff of sleep, has violated Plaintiff's First, Fourth, Fourteenth, 1985 Amendment, and constitutes an Eighth cruel and malicious punishment. Causing Rodriguez extreme emotional, mental, and even physical suffering.

58. Defendant Warden Haynes failing to correct the malicious conduct of Center Control Officials, and encouraging the continuation of that misconduct violates Rodriguez's rights under the Fourth, Eighth, Fourteenth Amendment of USC and causes Plaintiff Rodriguez's emotional, mental, and even physical suffering.

## VI. PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully prays this court

59. Grants Rodriguez a declaration of the acts and omissions described herein violate his rights under USC and laws.

60. A preliminary and permanent injunction ordering defendants Center Control Officers, and Warden Haynes, to cease their malicious conduct of locking Plaintiff's cell light.

61. Grant punitive and compensatory damage in the amount of $15,000 against defendant Touhami.

Complaint Page 30 of 31

62. Grant punitive and compensatory damages in the amount of $12,000 against each defendant John Doe One, Doe Two, and Doe Three. $36,000 jointly.

63. Grant punitive and compensatory damages in the amount of $4,000 against each defendant Sgt. Collins, and Sgt. Rigsby. $8,000 jointly.

64. Grant punitive and compensatory damages in the amount of $5,000 against each defendant Hanson N.P, and Mul Downey P.A.-C. $10,000 jointly.

65. Grant punitive and compensatory damages in the amount of $30,000 against the Center Control Officers, jointly.

66. Grant punitive and compensatory damages in the amount of $3,500 against defendant Warden Haynes.

67. Grant punitive and compensatory damages in the amount of $1,300 against defendants Sgt. Rigsby, and Kerri Howard for property damage, jointly.

68. Plaintiff seeks a jury trail on all issues triable by jury.

Complaint Page 31 of 31

69. Plaintiff seeks recovery of his cost in this suit, and any additional relief this court deems just and proper.

70. Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs described herein. Plaintiff has been and will continue to be irreparably injured by the conduct of the defendants unless this court grants declaratory and injunctive and compensation relief which Plaintiff seeks.

## VERIFICATION

I have read the foregoing complaint and hereby verify the matters therein are true, and to matters on information and belief and experience, I declare them true. I certify under penalty of perjury that the foregoing is **true** and correct.

Executed at Gib Lewis Unit on: June 21, 2017

Respectfully,

Frank Rod Jr.

Frank W. Rodriguez #1667156
Gib Lewis High Security
777 F.M. 3497
Woodville, TX 75990